UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION – DETROIT

In the Matter of:

                                   Case No. 15-51011

Oakland Physicians Medical Center,
L.L.C. d/b/a Doctors' Hospital of
Michigan, a Michigan limited liability company,        Chapter 11
                                   Hon. Maria L. Oxholm

        Debtor
_____/

Basil T. Simon, not individually but solely
in his capacity as the Liquidation Trustee of
Oakland Physicians Medical Center, LLC,
Liquidation Trust,

        Plaintiff,                           Adv. Proc. No. 16-05125

v.

Michael Short,

        Defendant.
_____/

## OPINION AFTER TRIAL

### I. INTRODUCTION

This matter is before the Court after a September 25 and 26, 2018 trial on the single issue of whether pre-petition advances by defendant Michael Short ("Defendant") to debtor Oakland Physicians Medical Center, L.L.C., d/b/a Doctors' Hospital of Michigan, ("Debtor" or "the Hospital") constitute capital contributions or debt. The plaintiff Basil T. Simon ("Plaintiff"), in his capacity as the liquidation trustee of Debtor, filed this adversary proceeding to avoid prepetition transfers from Debtor to Defendant. Specifically, Plaintiff alleges the following counts in this adversary proceeding: Count I – Claim for Re-Characterization of any Advances by Defendant;

1

Count II – Preferential Transfers – 11 U.S.C. §§ 547(b), 550(a) and 551; Count III – Fraudulent Transfers – 11 U.S.C. §§ 548(a)(1)(A), 548(a)(1)(B), 550 and 551; Count IV – Avoidance of Fraudulent Transfers under Michigan's Uniform Fraudulent Transfer Act, M.C.L. §§ 566.31 et seq[1], and 11 U.S.C. §§ 544(b) and 550; Count V – Breach of Statutory Duties to Act in Good Faith and in the Best Interests of the Company; Count VI – Equitable Subordination of Claims; and Count VII – Claim Disallowance 11 U.S.C. §502(d). (Second Am. Compl., ECF No. 145).

After numerous dispositive motions, rulings and amendments to the complaint, Defendant filed his fourth motion for partial summary judgment pursuant to Fed. R. Civ. P. 56 or, in the alternative, dismissal pursuant to Fed. R. Civ. P. 12(b)(6) of Counts III, IV, V and VI of the second amended complaint. In relevant part, Defendant once again argued that the pre-petition transfers from Debtor to Defendant were in repayment of loans Defendant advanced to Debtor (Def.'s Fourth Mot. for Partial Summ. J., or in the alt., Dismissal Pursuant to Fed. R. Civ. P. 12(b)(6), ECF No. 163), while Plaintiff maintained that the advances were in fact capital contributions. (Pl.'s Resp. to Def.'s Fourth Mot. For Partial Summ. J., or in the alt., Dismissal Pursuant to Fed. R. Civ. P. 12(b)(6), ECF No. 168). The crux of all the remaining claims is whether Defendant's pre-petition advances to Debtor constitute debt or capital contributions. At a hearing on September 13, 2018, the Court ruled that there is a genuine issue of material fact on whether the advances constituted debt or capital contributions and ordered an evidentiary hearing on this limited issue.[2]

The following constitutes the Court's findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52, made applicable by Fed. R. Bankr. P. 7052. For the reasons set forth below, the Court finds that the two advances evidenced by executed promissory notes—the July 1, 2011

---

[1] Currently known as the Uniform Voidable Transactions Act. M.C.L. § 566.45.
[2] At the September 13, 2018 hearing, the parties agreed that this issue is central to their case and a ruling on it would likely resolve the remaining claims.

note in the principal amount of $100,000.00 and the December 28, 2012 note in the principal amount of $114,000.00—were loans. The remaining advances, aside from the June 29, 2015 advance that was considered and decided in a separate motion for partial summary judgment of Count II – Preferential Transfers, were capital contributions.

## II. JURISDICTION AND RELATED ISSUES

This Court has jurisdiction pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157. This adversary proceeding seeks to avoid and recover prepetition advances as fraudulent and therefore is a core proceeding as defined in 28 U.S.C. § 157(b)(2)(H).

The parties have submitted a final pretrial order containing a stipulation of facts and outlining issues of fact and law to be litigated at trial. (Final Pretrial Order Re: Evidentiary Hr'g September 25, 2018, ECF No. 175). The parties additionally filed post-hearing findings of fact and conclusions of law (Pl.'s Proposed Findings of Fact and Conclusions of Law, ECF No. 188 and Def.'s Proposed Findings of Fact and Conclusions of Law, ECF No. 190), and post-trial briefs. (Pl.'s Post-Evidentiary Hr'g Brief, ECF No. 189 and Def.'s Post-Trial Brief, ECF No. 194).

As a preliminary matter, the Court wants to clarify the limited scope of the trial as some of the issues raised in the post-trial briefs were not grounds for either the relief sought, or the objection, to the fourth motion for partial summary judgment. In his post-trial brief, Plaintiff analyzed a number of factors (the *Roth Steel* factors) for determining whether a claim is debt or a capital contribution as discussed in *Bayer Corp. v. MascoTech, Inc.* (*In re Autostyle Plastics, Inc.*), 269 F.3d 726 (6th Cir. 2001) and *Retirement Benefit Plan of Graphic Arts International Union Local 20-B v. Standard Bindery Co.*, 654 F. Supp. 770, 774 (E.D. Mich. 1986). Defendant objected to this line of inquiry as recharacterization of Defendant's claim was outside the scope of the hearing. The Court agrees that neither party moved for summary judgment on Count I – Claim for

Re-Characterization of any advances by Defendant, and it will not be decided in this opinion. However, Plaintiff is not using the *Roth Steel* factors to recharacterize Defendant's claim. Rather, he is using the factors to establish that the advances were capital contributions, and thus Debtor's transfers to Defendant were not on account of antecedent debt as required by the reasonably equivalent value element of § 548(a)(1)(B) and M.C.L. § 566.35. The *Roth Steel* factors are equally relevant in evaluating whether an advance is debt or a capital contribution when making the determination of the reasonably equivalent value element under § 548(a)(1)(B) and M.C.L. § 566.35. The Court will consider the *Roth Steel* factors for this purpose. Defendant did not cite to any authority which would preclude Plaintiff from using these factors in this way.

In Defendant's post-trial brief, he asserts that two of Plaintiff's arguments—(1) the lack of definiteness of the terms of repayment and (2) defenses under § 548(c) and M.C.L. § 566.38(4)— should not be considered because they were not in the final pretrial order, citing to *McKinney v. Galvin*, 701 F.2d 584, 586 (6th Cir. 1983) (party's failure to advance theories of recovery in pretrial statement constitutes waiver). The Court will consider Plaintiff's argument that a lack of definiteness of the terms of repayment of the advances renders them unenforceable as loans. Plaintiff has maintained, in all his dispositive pleadings, that Defendant does not know the terms of the alleged notes, including interest rates and maturity dates. Additionally, Plaintiff presented this as an issue to be litigated in the final pre-trial order. The specific issue presented was, "Why do the unsigned promissory notes lack the characteristics of an enforceable loan document, including (a) a specified interest rate, (b) a repayment schedule, (c) a maturity date ?" (FPTO, 8, ECF No. 175).

The Court will not consider the defenses under Section 548(c) of the Bankruptcy Code and M.C.L. § 566.38(4), the corresponding state-law provision. Defendant maintains that these issues

4

were not in the final pretrial order. The defenses and their waiver have not been raised in Plaintiff's response to Defendant's fourth motion for partial summary judgment, or prior pleadings, and will not be considered in this opinion.

## III. ANALYSIS

### a. Findings of Fact

#### i. Background

By way of background, it is undisputed that Debtor was formed in 2008 to acquire the assets of Pontiac General Hospital. Debtor's members, who at the time consisted of approximately 45 physicians and McLaren Health Care ("McLaren"), invested millions of dollars into Debtor. In 2010, McLaren disassociated itself from the Hospital and demanded repayment of its secured loan. The member-physicians made advances to Debtor to enable it to pay off the debt owed to McLaren and to later finance Debtor's revival.

#### ii. Stipulated Facts

The parties have stipulated to the following facts. At all relevant times, Defendant, a practicing psychiatrist, was a member on the board of directors of Debtor.[3] Debtor's Operating Agreement "Schedule of Members" reflects that Defendant made a capital contribution to Debtor in the amount of $250,000.00 on or about June 1, 2009 in exchange for 50 "Class B" membership units. Defendant was one of approximately 42 members in Debtor as of June 1, 2009. Defendant maintained a private practice at an office outside of the Hospital as well as provided inpatient services at the Hospital.

Despite the member-physician efforts to revive Debtor, Debtor suffered losses between 2010 and 2015 and required continued cash advances from its members in order to continue its

---

[3] Defendant is not on the board of directors of the reorganized Debtor.

5

operations. Between November 1, 2011 and July 1, 2015, Defendant made 20 advances ("Advances") to Debtor totaling $1,632,333.34. From April 1, 2013 to July 17, 2015, Debtor transferred $571,939.44 back to Defendant. The dates and amounts of the Advances and payments to Defendant are reflected in the chart below that was admitted by stipulation of the parties. [4] The column titled "Pmt. By Defendant" matches the dates and amounts set forth in Exhibit A to Plaintiff's second amended complaint, which is the same as Plaintiff's Exhibit 4. The "Repayment" column, in turn, matches the dates and amounts contained in Exhibit B to Plaintiff's second amended complaint, and is the same as Plaintiff's Exhibit 5. The parties refer to these exhibits interchangeably. For clarification, the headings used on the following chart are the same ones the parties used in their stipulated facts; however, these headings are misleading as the parties used different terms in their arguments and briefs to describe the headings. For accuracy and consistency with the record, the heading "Pmt. By Defendant" is referred to as the "Advances" similarly the "Repayment" heading refers to Debtor's transfers to Defendant.

| Date | Pmt. by Defendant | Repayment |
|------|-------------------|-----------|
|      |                   |           |
| 11/01/11 | 150,000.00    |           |
| 07/03/12 | 100,000.00    |           |
| 07/25/12 | 100,000.00    |           |
| 08/07/12 | 100,000.00    |           |
| 12/28/12 | 114,000.00    |           |
| 02/13/13 | 200,000.00    |           |
| 04/01/13 |               | -204,000.00 |
| 04/15/13 | 150,000.00    |           |

---

[4] The June 29, 2015 advance in the amount of $100,000 from Defendant to Debtor, referred to as the handshake loan by the parties, and the subsequent three transfers (July 2, 15 and 17 of 2015) in the amounts of $30,000.00, $35,000.000, and $35,000.000 respectively, were considered and decided in a separate motion for partial summary judgment of Count II – Preferential Transfers in favor of Plaintiff. Significantly, the ruling was based in part on a stipulation of facts that the June 29, 2015 advance was a loan for the purposes of that motion. (Op. and Order Den. Def.'s Mot. For Recons. of the Ct.'s Order Grant Partial Summ. J. as to Count II of Pl.'s Compl, 6, ECF No. 153). Defendant has raised but failed to develop numerous estoppel arguments. The Court denied the application of these estoppel doctrines for lack of analysis. (Hr'g Tr. March 15, 2018, 4-5, ECF No. 135; Hr'g Tr. March 8, 2018, 3, ECF No. 137; and Hr'g February 15, 2018, at 3:55:19p.m.-4:21:07p.m, ECF No. 98).

| Date | Deposits | Withdrawals |
|------|----------|-------------|
| 04/15/13 | 150,000.00 | |
| 04/16/13 | | -35,250.56 |
| 04/24/13 | | -3,866.67 |
| 06/21/13 | | -3,866.67 |
| 06/21/13 | | -3,445.00 |
| 06/27/13 | 50,000.00 | |
| 07/26/13 | | -4,700.00 |
| 08/22/13 | 25,000.00 | |
| 09/13/13 | | -4,700.00 |
| 09/24/13 | | -25,000.00 |
| 09/27/13 | | -4,700.00 |
| 10/16/13 | 50,000.00 | |
| 10/21/13 | 10,000.00 | |
| 11/08/13 | | -8,117.00 |
| 12/05/13 | | -8,117.00 |
| 01/17/14 | | -833.30 |
| 01/17/14 | | -7,283.30 |
| 02/12/14 | | -833.30 |
| 02/12/14 | | -7,283.30 |
| 03/20/14 | | -6,610.00 |
| 04/17/14 | 25,000.00 | |
| 04/21/14 | 25,000.00 | |
| 07/01/14 | 50,000.00 | |
| 07/02/14 | 50,000.00 | |
| 07/03/14 | | -10,000.00 |
| 07/03/14 | | -33,333.34 |
| 07/03/14 | | -50,000.00 |
| 07/03/14 | | -50,000.00 |
| 07/14/14 | 33,333.34 | |
| 08/31/14 | 100,000.00 | |
| 12/02/14 | 50,000.00 | |
| 06/29/15 | 100,000.00 | |
| 07/02/15 | | -30,000.00 |
| 07/15/15 | | -35,000.00 |
| 07/17/15 | | -35,000.00 |
| **TOTALS** | **1,632,333.34** | **-571,939.44** |

7

The Advances by Defendant to Debtor are recorded in Debtor's books and records as loans, not capital contributions. Debtor's records do not show an adjustment of the membership units as a result of the Advances by Defendant, or any other member.

On February 5, 2015, Dr. Surindar Jolly ("Dr. Jolly"), another member of Debtor's board of directors and of the reorganized Debtor, filed a complaint against Debtor in the Oakland County Circuit Court ("OCCC") to enforce his promissory notes. Attached to that complaint were copies of a number of executed promissory notes in his favor evidencing the existence of loans.

On July 22, 2015, Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code. Debtor's Schedule F listed "loan" owed to Defendant in the amount of $952,377.80. An amended Schedule F filed by the reorganized Debtor on July 28, 2017, lists "loan and board fees owed" to Defendant in the (disputed) amount of $952,377.80. During discovery, Plaintiff produced among other documents, unsigned forms of promissory notes, as listed in Defendant's exhibit list. Furthermore, Debtor's Statement of Financial Affairs, which shows the membership units owed by the various members, reflects no adjustment due to the Advances. Accordingly, Defendant's interest in Debtor remained at 50 membership units.

### iii. Judicial Notice of Docket Entries and Defendant's Proof of Claim in the Underlying Bankruptcy Case No. 15-51011

On August 24, 2016, Defendant filed a proof of claim in the amount of $952,377.80 for "monies loaned." (Claim #109). There were no supporting documents attached to the claim. On October 28, 2016, Plaintiff objected to the claim. This avoidance action followed.

### iv. Evidence Deduced at Trial

#### 1. Debtor's Financial Condition

The parties do not dispute Debtor's insolvency. The record before the Court shows the following picture of Debtor's financial condition.

Between 2010 and 2015, Debtor suffered losses and could not pay the payroll, taxes, and vendors, and allowed medical malpractice insurance to lapse. (Trial Tr., vol. 1, 178-179, Sept. 25, 2018, ECF No. 184; Trial Tr., vol. 2, 10, Sept. 26, 2018, ECF No. 185). Both Dr. Jolly and Dr. Yatinder Singhal ("Dr. Singhal") testified that Debtor could not borrow from traditional lenders. (Trial Tr., vol. 1, 178; Trial Tr., vol. 2, 12). According to the board minutes dated April 13, 2013, "the only readily available short term financing are physicians at DHOM." (Def.'s Ex. N). Debtor obtained advances from approximately 16 member physicians. (Trial Tr., vol. 1, 111, 131-133, 143, 148-149, 154, 200, 208, 213).

Defendant and Dr. Singhal testified that they were advised that the doctors were prohibited by law from adding to their membership units. (Trial Tr., vol. 1, 73; Trial Tr., vol. 2, 12). From 2010 to 2015, Defendant, Dr. Jolly and Dr. Singhal held a majority of the membership units in Debtor and only the three of them served on the board of directors of Debtor.[5] (Trial Tr., vol. 2, 52). Dr. Singhal also testified that most of the money that was advanced to Debtor came primarily from the majority members, Dr. Jolly, Dr. Singhal and Defendant. (Trial Tr., vol. 2, 11). Dr. Singhal further testified that on each occasion the three of them advanced money the other shareholders were not asked for money because, "It wouldn't make any sense when they told us we were not putting in any more money." (Trial Tr., vol. 2, 61). But, according to Defendant and Dr. Singhal, the advances were not in direct proportion to the equity ownership interests. (Trial Tr., vol. 1, 111; Trial Tr., vol. 2, 53).

---

[5] Dr. Singhal owns 231 membership units in Debtor, but not the Reorganized Debtor. (Trial Tr., vol. 2, 50-51). He served on the board of directors from approximately 2012 to 2014 and was Chairman of the Board during part of that time. (Trial Tr., vol. 2, 6). Dr. Jolly owns 65 membership units in Debtor. (Trial Tr., vol. 2, 51; Pl.'s Ex. 1, 36). Dr. Jolly was on the board of directors of Debtor "from the end of 2011 until he was let go in August 2014." (Trial Tr., vol. 1, 176).

9

Plaintiff hired Kevin Berry ("Mr. Berry"), a CPA accredited in business valuation by the American Institute of Certified Public Accountants, a certified turnaround professional and a chartered global management accountant, to investigate Debtor's records. Mr. Berry was tasked with determining the date of insolvency, preparing a liquidation analysis on Debtor's underlying bankruptcy case, and reviewing Defendant's redacted tax returns. (Trial Tr., vol. 1, 21, 41; Liquidation Analysis, Pl.'s Ex. 2).

Mr. Berry determined Debtor's insolvency date as at least November 2012 and continuing through the petition date. (Trial Tr., vol. 1, 32). Mr. Berry testified that the difficulty he experienced in trying to complete his investigation was due, in part, to the significant turnover of top employees at the Hospital,

> Well, there was significant turnover at the hospital in the, kind of, CEO, CFO, and controller ranks pre-petition. I became involved with the hospital on the date of the filing, at which time there was sort of a part-time person in a quasi-CFO role. That individual phased out and a controller was brought in almost immediately after the filing. After about five or six weeks, she departed and Marsha Feighner came in as controller and she stays -- continues to be with the hospital today. So there were, you know, a variety of people involved, but there was a significant, you know, turnover in the pre-petition.

(Trial Tr., vol. 1, 24). Mr. Berry additionally found Debtor's financial reporting in "a state of disarray[.]" (Trial Tr., vol. 1, 25). Marsha Feighner ("Ms. Feighner"), Debtor's controller, assisted Mr. Berry in completing Debtor's financial picture.

*2. Debtor's Records*

While Mr. Berry and Ms. Feighner testified that they worked diligently to locate documents relevant to the transfers at issue, they could not match the transfers to the notes, or any other documents they could find. (Trial Tr., vol. 1, 25 and 40). Mr. Berry and Ms. Feighner prepared schedules A and B (Pl.'s Ex. 4 and 5) listing the Advances by, and transfers to, Defendant.

10

Defendant contends that Debtor maintained an internal record of advances made by members and other entities who are not listed on the Schedule of Members as of June 1, 2009 entitled "Shareholder, Director, Officer, Doctors Loans" ("Loan Summary"). (Def.'s Ex. A). Defendant claims that this Loan Summary was created by Ms. Feighner after she reviewed Debtor's records, including cash receipts, check registers and wire transfers (Trial Tr., vol. 1, 214, 230-231). Defendant further claims that his Advances are reflected on the Loan Summary. (Trial Tr., vol. 1, 111, 126-127, 131-133, 143, 148-149, 154, 170, 213; Def.'s Ex. A). The Loan Summary includes entries for the unsigned forms of promissory notes that were located in Debtor's records. (Def.'s Ex. G-K; Trial Tr., vol. 1, 229-230, 232-238). Defendant additionally asserts that his unsigned promissory notes in Debtor's records matched the signed versions of Dr. Jolly's notes attached to Dr. Jolly's state court complaint, Dr. Seifelden's proof of claim (Def.'s Ex. O), and Dr. Singhal's "lost notes affidavit." (Trial Tr., vol. 1, 243-244; Def.'s Ex. A, E-M).

Plaintiff points out that, in reviewing Debtor's books and records, the notes Ms. Feighner found were not executed; and in her words, the unexecuted notes were the equivalent of "blank sheets of paper." (Trial Tr., vol. 1, 217). Further, Ms. Feighner was only employed by Debtor as controller in 2015. Despite her efforts to reconstruct the transactions, Plaintiff still questions the accuracy of the Loan Summary as it did not include all of the notes attached to Dr. Jolly's complaint in the OCCC case and it misstated the principal amount of one of Dr. Jolly's notes. (Trial Tr., vol. 1, 243).

After reviewing the testimony and the relevant exhibits, the Court finds that the Loan Summary is of limited probative value to establish the Advances were loans. First, the Loan Summary was not simultaneously maintained at the time of the transactions by an individual with first hand knowledge. Rather, the Loan Summary is Ms. Feighner's best effort to recreate Debtor's

11

disordered book keeping, and does not establish that the unsigned notes were executed or that the Advances were loans. She was employed in 2015 by Debtor after the time of the transactions at issue and testified that when she started her employment with Debtor, "there was a document similar to this that was put together by a gentleman whose first is name Naveen. However, it didn't have as much detail, and I recreated this document by going through all the records that I could find." (Trial Tr., vol. 1, 214). This included reviewing, in addition to the records stated by Defendant, the unsigned promissory notes and board meeting minutes. (Trial Tr., vol. 1, 215). Lastly, the Court finds that the Loan Summary contains discrepancies and is of limited reliability. The Loan Summary omits Dr. Jolly's executed note, Loan Ref. ST-31, that was attached to his state court complaint, and misstates the principal amount of Loan ST-08 as $60,000.00, instead of $70,000.00. (Trial Tr., vol. 1, 242-243). Because the Loan Summary was not maintained at the time the transactions were made, was made by an individual without first-hand knowledge of these transactions, and given the many discrepancies, the Loan Summary has limited probative value.

Besides the existence of the Loan Summary, Defendant maintains that Debtor lost most of the originals or copies of promissory notes evidencing the Advances made by Defendant and other members (Trial Tr., vol. 1, 71, 104-105, 199; Trial Tr., vol. 2, 48-49). Furthermore, Defendant stresses that some of Debtor's financial records are impossible to obtain as the reorganized Debtor no longer uses or has access to the accounting software known as "CPSI," which was previously used by Debtor. (FPTO, 6, ECF No. 175; Trial Tr., vol. 1, 218-219).

While the Court acknowledges that Debtor's records were in a state of disarray, and that the reorganized Debtor no longer uses CPSI, the missing notes cannot be attributed to Defendant's use of new accounting software. Ms. Feighner testified that she printed off every possible report that she could and was able to take Debtor's general ledger from the CPSI system and "dump the

12

whole general ledger into . . . our computers, and so I have the whole GL detail for everything."

(Trial Tr., vol. 1, 219). Defendant—as a board member, the financial advisor on the financial

subcommittee of the board, and a party to the purported notes—was in the best position to preserve

the notes.

Nevertheless, Defendant argues that from Debtor's available records, the records indicate

that the members only made a capital contribution to purchase their respective membership

interests as shown in the Schedule of Members. (Trial Tr., vol. 1, 58-62). Defendant further asserts

that none of the advances made by the members were treated by Debtor as capital contributions;

rather, they were all recorded as loans. Defendant claims that Debtor maintained a separate general

ledger account for member equity, which shows the capital contributions made by each member.

(Trial Tr., vol. 1, 61-62). Finally, Defendant cites to Debtor's minutes of board of directors'

meetings which contain multiple references to "loans" as opposed to advances or contributions.

(Def.'s Ex. N). Additionally, Defendant refers to Debtor's Statement of Financial Affairs prepared

and filed by Debtor which lists "loan payments" made by Debtor to 11 doctors, including Drs.

Jolly, Singhal and Defendant. (Def.'s Ex. C, Case No. 15-51011, ECF No. 93.2).

Plaintiff asserts that Debtor's records reflect that Debtor treated the Advances as

contributions, regardless of using the term "loan" on certain documents. They were recorded on

the books as loans because, as Defendant testified, the doctors were prohibited by law from adding

to their membership units. (Trial Tr., vol. 1, 73; Trial Tr., vol. 2, 12). Plaintiff stresses that Ms.

Feighner testified that in her thirty years of experience as a controller, every loan transaction

required a corresponding amortization schedule with interest. If interest was not paid it would be

accrued. However, Debtor did not maintain an amortization schedule for any loans. (Trial Tr., vol.

1, 225). Moreover, according to Ms. Feighner when a payment was made, the person instructing

13

that a payment be made would not identify the loan to which the payment should be applied. (Trial Tr., vol. 1, 225). Finally, Plaintiff claims that the Loan Summary lists certain capital contributions that were paid for "Class E Stock" as "loans" because Ms. Feighner was instructed by an unnamed attorney to "just treat it as a loan." (Trial Tr., vol. 1, 244-246).

While Defendant does not dispute that Debtor did not set up amortization schedules in its accounting system, Defendant contends that there was no amortization schedule for any of the advances made by the doctors, including Dr. Jolly. (Trial Tr., vol. 1, 225). Defendant claims that Debtor maintained a general ledger account for his and other member loans. (Trial Tr., vol. 1, 60). Defendant asserts that the general ledger account number set up by Debtor to record the Advances indicates that it is a liability account. (Trial Tr., vol. 1, 220). Thus, when Debtor made a payment on a loan from one of its doctors, Defendant claims Debtor did not record against which loan the payment should be applied; rather, Debtor applied the payment against the aggregated liability account of the particular doctor. (Trial Tr., vol.1, 225-226).

The Court finds that the overwhelming evidence in Debtor's records suggests the Advances were capital contributions. The use of the term "loans" on the Loan Summary, board meeting minutes, or the Statement of Financial Affairs is not dispositive on the issue of whether the Advances were loans. Significantly, the Court finds that because the doctors were prohibited by law from adding to their membership units, none of their advances were recorded by Debtor as capital contributions. This is also the reason why Debtor recorded the advances as loans despite not treating them as such. Defendant's "general ledger accounting" argument does not answer how Debtor kept track of interest and any applicable late fees. Without identifying the particular loan to be repaid there is no way to track the interest rate to be applied to the repayment, any accrued interest, or any late fees that should be assessed. It is notable that Mr. Berry was critical

of Debtor's financial reporting system. According to Ms. Feighner, if posted correctly she could determine whether a particular payment to Defendant was applied to his loan account. (Trial Tr., vol. 1, 225). She could not determine whether any specific payment was paid on a particular promissory note. (Trial Tr., vol. 1, 225). When questioned regarding what she would do to show interest, Ms. Feighner testified,

> Well, if it -- if it was a loan, there would be, if it was a loan it, there -- in my experience, and I've been a corporate controller for 30 years, when a corporation has a loan there's an amortization schedule set up with interest, and if the interest isn't paid it's accrued; there was nothing like that set up at Doctors' Hospital.

(Trial Tr., vol. 1, 225). Thus, Debtor's system was not structured to track interest on any loans.

Outside of Debtor's internal records, no other records or documents have been submitted to demonstrate how Debtor represented the Advances outside of the Hospital. Neither party produced any public document to demonstrate the Advances were presented as capital contributions or loans. Based on the evidence presented, the Court finds that Debtor's records do not reflect that Debtor treated the Advances as loans regardless of the terminology used by Debtor to record the Advances.

*3. Notes*

Despite serving on the board of directors and as financial advisor on the financial subcommittee of the board, (Def.'s Ex. N; Trial Tr., vol. 1, 158; Trial Tr., vol. 2, 29), Defendant's trial testimony demonstrates Defendant's carelessness, lack of knowledge, and total disregard for the issuance, terms, and enforcement of the alleged notes. Defendant testified that when he made loans to Debtor there was always a note that was prepared to evidence the loan. (Trial Tr., vol. 1, 122). Defendant stressed that each of the Advances shown on Exhibit A to the second amended complaint was evidenced by a promissory note. (Trial Dep., vol. 1, 112-114, 122). Defendant testified that the notes were prepared by the secretaries for Debtor's chief financial officer and/or

15

the chief executive officer. (Trial Tr., vol. 1, 123). Defendant expected Debtor to maintain records of the loans and relied on Debtor to keep the originals or copies of his promissory notes. (Trial Tr., vol. 1, 71, 144). Defendant testified that when he attempted to obtain the notes, Liz Knisley, Debtor's CEO at the time, advised him that the notes disappeared. (Trial Tr., vol. 1, 71). Defendant additionally claimed he kept the promissory notes at his office and at home but, as of the date of the trial, was not able to locate them. (Trial Tr., vol. 1, 72).

Defendant produced only two executed promissory notes. The first note, titled "Promissory Note-Doctor's Hospital of Michigan" dated July 1, 2011, identifies Debtor as the borrower and Defendant as the lender and is signed by Defendant, Debtor's CEO and two witnesses. (Def.'s Ex. E). The note is in the principal amount of $100,000.00 with an annual interest rate of 20%. The note provides for monthly installment payments of $1,667.00 due on the first day of the month with the principal repaid in its entirety by the end of December 31, 2012. Under this note, the parties have waived "demand, presentment and protest and all notices hereto[,]" and agreed "to remain bound notwithstanding any extension, modification, waiver, or other indulgence or discharge or release of any obligor hereunder or exchange, substitution, or release of any collateral granted as security for this note." (Def.'s Ex. E). Finally, the note provides, "No modification or indulgence by any holder hereof shall be binding unless in writing[.]" (Def.'s Ex. E).

The second executed note is a "Demand Promissory Note" dated December 28, 2012 in the principal amount of $114,000.00. (Def.'s Ex. F). This note likewise identifies Debtor as the borrower and Defendant as the lender but is only signed by Debtor and a witness on a date unknown. Under the terms of this note,

> Borrower shall pay to Lender monthly installments of interest only on the principal amount then outstanding on the first day of each month commencing on July, 1,

16

2013 and continuing on the first(1st) day of each month thereafter until the later of December 31, 2013 or the date that is sixty (60) days following Borrower's receipt of Lender's "Demand Notice" (as hereinafter defined) (the "Maturity Date"), when the outstanding principal balance and all accrued and unpaid interest is due and payable, unless the indebtedness evidenced by this Note is accelerated, in which case, the Maturity Date is the date of acceleration. As used herein, the term "Termination Notice" means written notice from Lender notifying Borrower of Lender's intent to demand payment. Lender may demand payment at any time by providing written notice to Borrower.

The outstanding principal balance of this Note shall bear interest until the Maturity Date (whether by acceleration or otherwise) at a fixed rate of interest of ten (10%) percent per annum (the "Interest Rate").

(Def.'s Ex. F). The note also provides for a late charge of five (5%) percent of the payment amount if any payment is not received within 10 (ten) days of the due date. (Def.'s Ex. F). Additionally, the Borrower waived "presentment for payment, demand, notice of non-payment notice of protest and protest of this Note, diligence in collection or bringing suit." (Def.'s Ex. F).

In response to a discovery request, Plaintiff produced certain unsigned forms of promissory notes as listed in Defendant's exhibit list. (FPTO, 6, ECF No. 175). Beside the two signed notes, Defendant did not know the terms of the remaining notes (unsigned and missing notes). Defendant testified that he did not keep track of how much money he advanced to Debtor. (Trial Tr., vol.1, 70). He claims that most, if not all, the Advances bore interest. (Trial Tr., vol. 1, 150-151, 156, 160, 167). In attempting to match the unsigned notes to the Loan Summary, Defendant points to his Exhibits A, and E through K in arguing the interest rates ranged between 10% and 15%. Exhibit A is the Loan Summary, which the Court already discussed in the preceding section. Defendant's Exhibits E and F are the two signed notes discussed above. That leaves, Exhibits G through K. Ms. Feighner acknowledges finding these exhibits in the Hospital's records; specifically, on a computer. (Trial Tr., vol. 1, 228-229).

Exhibit K contains the unsigned promissory notes of other members. They include, Dr. Jolly, Dr. Singhal, Oakland Progressive Medical Group LLC, William E. Hill, M.D., Fidelity Investment Trust Account 7711135354500 c/o Dr. Michael Short, Riyadh P. Kasmikha M.D., P.C., Raouf R. Seifeldin, Prakash N. Sanghvi, Dr. Nikhil K. Hemady, Southfield Family Health Center C/O Dr. Riyadh P. Kasmikha, and Dr. Amarjeet Sethi. (Def.'s Ex. K).

Exhibits G through J are the four unsigned promissory notes introduced in favor of Defendant. Exhibit G titled "Demand Promissory Note" is a note dated February 13, 2013 in the amount of $200,000.00 with an annual interest rate of fifteen percent (15%). (Def.'s Ex. G). The maturity date of this note is "exactly One Month from the date of this promissory note." The note also provides for "a late charge of five percent (5%) of the payment amount" if any payment is not received by Lender within ten (10) days of the due date, and a waiver "of presentment for payment, demand, notice of non-payment notice of protest and protest of this Note, [and] diligence in collection or bringing suit." This note has a "loan closed" notation on the top right corner of the first page. Exhibit H is a June 27, 2013 "Demand Promissory Note" in the amount of $50,000.00 with an annual interest rate of ten percent (10%) per annum. (Def.'s Ex. H). The maturity date for this note is "exactly Three Months from the date of this promissory note." It provides for the same five percent (5%) late fee and the waiver of presentment clause included in the Exhibit G note. Exhibit H additionally has a "Loan Ref.: ST-O9" printed on the top right corner of the first page. Exhibit I is an August 22, 2013 "Demand Promissory Note" in the amount of $25,000.00 with an annual interest rate of ten percent (10%) per annum. (Def.'s Ex. I). It has the same three-month maturity date, five percent (5%) late fee and waiver of presentment clause as the Exhibit H note. This note contains "Loan Ref.: ST-20" printed on the top right corner of first page. Exhibit J is an October 16, 2013 "Demand Promissory Note" in the amount of $50,000.00 with an annual

interest rate of ten percent (10%) per annum.  (Def.'s Ex. J). The maturity date for this note is "exactly Forty Five Days from the date of this promissory note" with the same five percent (5%) late fee and waiver of presentment clause as the notes in Exhibits G, H and I.  This note contains a "Loan Ref.: ST-29" printed notation on top right corner of the first page.

While Defendant attempts to match these unsigned notes to the Loan Summary to establish that the Advances were loans, Defendant failed to properly authenticate these notes.  Defendant testified that a note was always prepared to evidence a loan but offered no evidence to corroborate his vague testimony or to prove that Exhibits G through J were executed.   First, Defendant did not create the notes, was not present when the notes were created, and was not a custodian of the notes. Second, Defendant does not know who prepared the notes or when they were prepared.  While Defendant testified that the notes were prepared "by the secretaries of the CEO or CFO" (Trial Tr., vol. 1, 123)—such testimony is not conclusive as Defendant fails to identify the secretaries, the CEO and/or the CFO, a difficult task considering Debtor's high employment turnover during the relevant time frame.   Third, Ms. Feighner did not create the notes and did not work for Debtor during the time the notes were purportedly created or executed.  Ms. Feighner testified that she was told that Dr. Singhal's secretary created the notes,

> I was told that she was the person who typed up all of these notes and had copies of all of these notes. Dr. Singhal had already left the hospital. I went to her to get copies of all the signed copies and she told me that she had them but she could never produce them.

(Trial Tr. vol. 1, 232).  Dr. Singhal's secretary was not called as a witness to authenticate the unsigned notes.

During the hearing, the Court admitted Exhibits G through K for the limited purpose of showing that the Advances were made, not to show that the unsigned promissory notes were executed.  Given this ruling, Defendant's attempt to match the notes to the Loan Summary is

irrelevant as the parties stipulated that the Advances were made. Based on the evidence presented, the Court cannot conclude with any certainty that the terms contained in the promissory notes attached as Exhibits G through J were entered into and that the terms of those notes govern the subject transactions.

The Court finds the Loan Summary does not prove that the notes were executed and that the terms of the unsigned notes governed the transfers at issue. When questioned on the Loan Summary, and specifically where she derived the listing of maturity dates in the last column, Ms. Feighner answered,

> From the promissory notes that I found. However, none of the promissory notes that I have found had been executed, so all they were . . . blank sheets of paper. But for purposes of recordkeeping I used the numbers on these notes that I found.

(Trial Tr., vol. 1, 217). Ms. Feighner testified that she keeps a list of all contracts; however, according to her, "contracts are not confirmed until they're executed by both parties." (Trial Tr. vol. 1, 227). Regarding where she derived the numbers representing the interest, Ms. Feighner testified that "these were taken directly off the paperwork. As you can see, at one point it all changes to ten percent because at the, one of the board meetings it was agreed that all these advances, the interest would no longer be calculated at anything above ten percent." (Trial Tr., vol. 1, 217). Thus, Ms. Feighner herself acknowledged that the Loan Summary is her best effort to reconstruct Debtor's record keeping. It is a circular argument to try to match numbers from unsigned notes to a Loan Summary to prove that the notes were executed, since certain numbers on the Loan Summary came from the unsigned notes--and not from an independent source.

### 4. Transfers to Defendant

The Court finds Defendant's testimony regarding Debtor's transfers to Defendant vague. He could not explain why the payments on Exhibit B to the second amended complaint were made.

(Trial Tr., vol. 1, 99). Defendant also could not correlate any of the transfers on Exhibit B to the second amended complaint (Plaintiff's Exhibit 5) to any of the signed notes or missing notes that evidenced the alleged loans on Exhibit A (Plaintiff's Exhibit 4). (Trial Tr., vol. 1, 110). In fact, after reviewing Debtor's records neither Ms. Feighner nor Mr. Berry could match the transfers to Defendant to any listed note. (Trial Tr., vol. 1, 40, 225). Furthermore, the amounts of the payments did not equal any of the Advances. (Pl.'s Ex. 4, 5; Trial Tr., vol. 1, 97-98).

During the trial, Defendant could not provide explanations for specific transactions. For example, Defendant did not know if the executed note dated July 1, 2011 in the principal amount of $100,000.00 (Def.'s Ex. E) had been repaid. (Trial Tr., vol. 1, 83-85). Also, in April 2013, Defendant received $250,000.00 in transfers and at the same time advanced $300,000.00 to Debtor. Defendant claimed that he was "changing interest rates"; however, he had no document to show that the transaction resulted in a new loan at a lower interest rate. (Trial Tr., vol. 1, 160-166).

Defendant and Dr. Singhal both testified that neither they nor the board of directors determined the timing of the transfers made by Debtor to Defendant. They explained that the transfers were authorized by either the chief financial officer or the chief executive officer of Debtor. (Trial Tr., vol. 1, 99-100, 145; Trial Tr., vol. 2, 12, 44-45). Notwithstanding the fact that Debtor was not timely paying Defendant's alleged loans, Defendant kept advancing more money to Debtor.

### 5. Defendant's Expectation of Payment on the Advances

Plaintiff maintains that Defendant did not expect to get repaid according to the terms of the alleged notes. First, Defendant testified that he expected repayment from Debtor when Debtor "was capable of making payments, whether it be capital returns or interest returns and it had available the funds for it…." (Trial Tr., vol. 1, 80-81). Defendant further testified that "at some

point in time we would be able to sell the hospital and that we would get repaid and we would make some money." (Defendant, Trial Tr., vol. 1, 109). Further, Plaintiff points to Defendant's and Dr. Singhal's affidavits filed in the OCCC lawsuit, filed by Dr. Jolly against Debtor, wherein they attest that the three board members agreed not to demand repayment until the Hospital was financially strong and capable of paying all investors. (Def.'s Ex. L; Pl.'s Ex. 6 & 7).

Defendant acknowledges that he, Dr. Singhal and certain other members agreed that they would not demand repayment of their respective notes if the Hospital could not then afford it (Trial Tr., vol. 1, 102, 118-119, 145-146, 156; Trial Tr., vol. 2, 17-18, 24, 28), but maintains that Debtor remained obligated to repay the Advances. (Trial Tr., vol. 1, 87, 127-128, 164; Trial Tr., vol.2, 13). Defendant disputes that he ever agreed that Debtor would not be obligated to repay the Advances or could delay or defer repayment until the Hospital was sold or new financing was obtained. (Trial Tr., vol.1, 80-81, 85-86, 101, 108, 117, 162).

Defendant further asserts that he anticipated that the Advances would be repaid from Debtor's cash flow, from Debtor's acquisition by another hospital operator, and/or from refinancing with another lender. (Trial Tr., vol.1, 101, 108, 117-118). Defendant further testified that his Advances had the same priority for repayment as Debtor's other unsecured creditors. (Trial Tr., vol. 1, 78, 80 81, 85-86, 108, 118). Finally, Defendant argues that he never agreed to subordinate the repayment of the Advances to other Hospital debt, and believed the Advances made by the members to Debtor would be treated *pari passu.* (Trial Tr., vol. 1, 80, 85-86, 101, 118, 153-154, 162).

The Court will first turn to the OCCC complaint, case no. 15-145364-CK (Def.'s Ex. L), filed by Dr. Jolly, along with Sanjay Jolly and Shree Investments, L.L.C. against Debtor on February 5, 2015, alleging three counts for breach of contract and one count for a claim of

attorneys' fees and costs.[6]  Significantly, attached to the OCCC complaint in Exhibit 1 were signed promissory notes executed in favor of Dr. Jolly (April 1, 2013 note for $215,000.00; April 1, 2013 note for $35,000.00; April 15, 2013 note for $300,000.00; May 31, 2013 note for $70,000.00; October 16, 2013 note for $100,000.00; November 30, 2013 note for $70,000.00; December 13, 2013 note for $50,000.00; April 1, 2013 note for $35,000.00; and April 1, 2013 note for $100,000.00) totaling $975,000.00.[7]  The OCCC entered a judgment against Debtor in the amount of $2,699,806.64 in principal and interest, and $13,353.81 in contractual costs and attorney fees, for a total judgment of $2,713,160.45.  (Def.'s Ex. V, 6).

Dr. Singhal filed an affidavit in the OCCC case to object to Dr. Jolly collecting on his promissory notes because the monies Dr. Jolly, Defendant and Dr. Singhal advanced were in fact investment contributions and could not be demanded or collected until the Hospital was financially able to pay them.  (Pl.'s Ex. 6; Trial Tr., vol. 2, 20).  Specifically, Dr. Singhal attested,

> 4. On multiple occasions from 2011 through 2014, the hospital was in urgent need of cash to remain operating.  The hospital did not have sufficient funds to meet payroll obligations, pay for needed supplies, and to pay key vendors and other physicians associated with Doctors' Hospital.  I, together with the two other Board members and owner members of Doctors' Hospital, Dr. Surindar Jolly and Dr. Michael Short, invested personal funds so that the hospital could meet critical cash needs.
>
> 5. **As owners of Doctors' Hospital**, it was appropriate for Drs. Jolly, Short and I to financially assist the hospital for the benefit of patients, employees, and the community, and to **protect our respective ownership interests.  I personally invested** over $2 million, and Dr. Short, the third Board member, also **invested** substantial sums, although less than Dr. Jolly and I did.

---

[6] The Complaint consists of four counts: (Count I) – Breach of Contract of Surindar Notes for a total of $1,025,000.00, exclusive of attorneys' fees and legal costs, interest and late charges; (Count II) – Breach of Contract of Sanjay Note for a total of $50,000.00, exclusive of attorneys' fees and legal costs, interest and late charges; (Count III) – Breach of Contract of Shree Note for a total of $840,000.00, exclusive of attorneys' fees and legal costs, interest and late charges; and (Count IV) – Claim for Attorneys' Fees and Costs.

[7] Other exhibits include, Exhibit 2 to the OCCC complaint, an executed note for $50,000.00 in favor of Sanjay Jolly. Exhibit 3 to the complaint is an executed note for $1,214,000.00 in favor of Shree Investment Group.  Also attached are two checks: a $50,000.00 check dated April 21, 2014 from Dr. Jolly made payable to Debtor for "loan payment for payroll" and a $150,000.00 check dated March 7, 2014 from Dr. Singhal to Debtor for "loan."

23

6. On occasions when investments were made, at various times between 2011 and 2014, it was management's decision to **memorialize our investments through promissory notes.**

7. I am familiar with the claims made by Dr. Jolly in this lawsuit and that he demands an immediate judgment based on what he now says was an unequivocal promise by Doctors' Hospital to repay notes on demand at any time past maturity dates. This is not an accurate, complete, and honest portrayal of the agreements regarding repayment. I know there are additional terms, because I participated in all of the transactions, along with Dr. Jolly and Dr. Short. I can say for certainty that **none of us, as the three major investors, would have risked hundreds of thousands of dollars, and in my case approximately $2 million, if any one of us was capable of calling notes due without regard for the hospital's financial condition. All three Board members recognized, understood, and agreed that we would need to wait for repayment, regardless of what the notes state on their face, until Doctors' Hospital had cash available to repay our investments.** (Dr. Jolly also made this agreement on behalf of the Plaintiff investment firm Shree Investment Group L.L.C., which Dr. Jolly controls, and on behalf of his son Sanjay Jolly.) This agreement applied consistently to all loans made by Drs. Jolly, Short and me. . . .

8. It is clear that from the period of April 1, 2013 through mid-2014, **Dr. Jolly continued to advance money to Doctors' Hospital even while money that he had previously invested was not repaid. Dr. Short and I did likewise. . . . Instead, all three of us continued to invest our personal funds, both implicitly and explicitly agreeing that we would wait until the hospital had cash available to repay us** and a few other Doctors' Hospital members who lent lesser amounts to the hospital.

9. **Dr. Jolly was removed from the Board in August 2014, at a time when Doctors' Hospital was still suffering from a critical cash shortage and was in no position to repay Dr. Jolly, Dr. Short, me, or other doctors. The hospital remains in this financial situation through this date**. . . .

10. Because the enforcement of any of the promissory notes would have caused Doctors' Hospital to have inadequate funds for its financial responsibilities and destroyed all equity interest held by its member owners, I made my contributions to Doctors' Hospital in reliance on Dr. Jolly's promise (as well as Dr. Short's) not to enforce his promissory notes until Doctors' Hospital's financial condition improved.
. . .

(Pl.'s Ex. 6) (emphasis added). Dr. Singhal additionally testified that "if we could call the loans at any time the hospital would shut down." (Trial Tr., vol. 1, 22). He said he expected repayment

at the end of the term "of the loans." But that if there was no promissory note that matched a particular investment there was no term. (Trial Tr., vol. 1, 23). Finally, Dr. Singhal refused to confirm that there was no reserve or sinking fund from which he and the other doctors could be assured that they would get repaid; he testified that the "[e]xpectation were it'll be paid, the loan, when the hospital do better." (Trial Tr., vol. 1, 17).

Defendant also filed an affidavit in the OCCC case, attached as Plaintiff's Exhibit 7. In the affidavit, Defendant attests that he is familiar with Dr. Jolly's allegations against Debtor and has read and agrees with Dr. Singhal's affidavit filed in the case. Defendant's affidavit highlights and reiterates some of the same points made by Dr. Singhal in his affidavit:

> 5. . . . **As an expedient method of documenting the contributions that Drs. Jolly, Singhal, and I made, we reflected the cash contributions in promissory notes issued by Doctors' Hospital.** On occasion, a few other doctors with membership interests also made contributions reflected in notes.

> 6. Although the notes provide for payment at the expiration of their stated terms, I can assure the Court that this language does not fully and accurately represent the terms of contemporaneous and subsequent agreements between Dr. Jolly, Dr. Singhal, me and Doctors' Hospital. As Dr. Singhal points out, **we all knew and understood that Doctors' Hospital did not have funds to repay notes on demand. When the three of us gave the hospital our personal funds to meet expenses, we knew and understood that in 30 days' time, 45 days' time, or one year, the hospital would not likely have available funds to repay us. Consequently, Drs. Jolly, Singhal, and I agreed amongst ourselves and with Doctors' Hospital that we would not demand repayment until Doctors' Hospital was financially strong and capable of repaying all investors (not just Dr. Jolly) or until there was a sale of the hospital that might generate cash available to pay us back. None of us (Drs. Jolly, Singhal and I) would have put in money if one of us could demand repayment and, worse yet, sue for repayment. All three of us and the hospital agreed that any collection effort would be deferred. Otherwise, it would destroy the hospital and our respective investments,** which is exactly what the cash infusions were intended to protect against.

> 7. I am familiar with Doctors' Hospital's financial condition today and what it was at the time Dr. Jolly filed this lawsuit. **Doctors' Hospital has been and remains in a difficult financial condition. It has barely enough funds to pay for normal operations and nothing available at this time to pay Dr. Jolly on the notes he**

**claims are due. A judgment in favor of Dr. Jolly would cause Doctors' Hospital to be unable to meet its critical financial needs and such a result is exactly opposite of what Drs. Jolly, Singhal and I intended to avoid and agreed not to do.**

(Pl.'s Ex. 7) (emphasis added).

The terminology in these affidavits undermines Defendant's insistence that he expected to be repaid. Defendant expected payment of his advance not as a traditional lender but as an investor or owner of a business who would share in any profit. Defendant testified that he and other doctors made this agreement back in 2012. However, Defendant is now backpedaling on the statements in his affidavit. Even if the Court accepts Defendant's testimony that he never agreed to await for payment until the Hospital was sold, and the agreement was that the Hospital would pay the Advances when it was financially able to pay all the doctors—this condition was likewise not satisfied, as evidenced by the resulting bankruptcy when Dr. Jolly attempted to collect on his notes. Debtor was in no position to pay the Advances of all the doctors, and therefore, the obligation to repay never arose.

When Defendant agreed to delay the payment of his Advances until the hospital was financially stable—he effectively subordinated his payment to the Hospital's other debt. Defendant can't have it both ways. It is inconsistent for Defendant to attest that he agreed to not demand repayment of his notes if the Hospital could not afford them and at the same time argue that Debtor remained obligated at all times to pay the Advances. Per Defendant's affidavit, Debtor's obligation to repay was conditional and arose only after the condition was met—that Debtor was financially stable. Defendant's wishful thinking about how he would be paid does not impact whether the condition for payment is satisfied. The Court finds Defendant's testimony— that he never agreed to subordinate the payment of his Advances to other Hospital debt— incredible.

Finally, Defendant's desperate attempt to compare himself to Dr. Jolly is not persuasive. First, and most notably, Dr. Jolly has executed promissory notes.[8]  Second, Dr. Jolly in his trial testimony adamantly disputes entering into an agreement with Defendant and Dr. Singhal to wait to make a demand on his notes until the Hospital was able to pay all the Advances.  (Trial Tr., 9/25/2018, p. 184-187).  In fact, Dr. Jolly testified that he always considered his advances as loans and wanted repayment on his loans as specified in the promissory notes.[9]  (Trial Tr., vol. 1, 185). Third, Dr. Jolly's prior actions support his trial testimony.  Dr. Jolly made a demand to enforce his notes by filing a complaint in OCCC to collect on his notes.[10]  Finally, Dr. Jolly has a judgment regarding his notes, which he attempted to enforce resulting in Debtor's bankruptcy filing.

In contrast, Defendant did not expect to be repaid on any alleged notes according to their terms as he (1) has only two signed promissory notes; (2)  does not know the terms of the other alleged loans; (3) has not kept track of the money he advanced; (4) has no idea which of the advances have been paid; (5) attested that he agreed not to make a demand on his notes until the Hospital was able to repay; (6)  explicitly called his Advances investments in an affidavit created and filed for the purpose of preventing another doctor from collecting on executed promissory notes; (7) agreed with Dr. Singhal's affidavit that the terms of the notes are meaningless; and (8) testified that, prior to Debtor's bankruptcy, he did not make a demand on his notes.  Clearly, Defendant did not expect to be repaid on any alleged notes pursuant to their terms.  Rather, Defendant was willing to keep investing more money into the Hospital with the hope of getting a return on his investment.

---

[8] Dr. Jolly testified that he always asked for a promissory note whenever he lent money to the Hospital; he received a note most of the time.  He testified that he attempted to compare the notes that he had with the Hospital's copies but was unable to as the Hospital did not have any copies of his notes.  (Trial Tr., vol. 1, 180-183, 197-199).

[9] He testified that he was not in privy to know how the other doctors' advances were treated.  (Trial Tr., vol. 1, 208).

[10] Dr. Jolly testified that he was forced out of the Hospital when he refused to put more money into the Hospital. (Trial. Tr. vol. 1, 179, 186). The Hospital did not pay Dr. Jolly's notes upon his discharge forcing him to file a lawsuit. (Trial Tr. vol. 1, 183).

27

**b. Legal Standard**

i. Constructive Fraud under 11 U.S.C. § 548(a)(1)(B)

Section 548(a)(1) provides, in pertinent part:

The trustee may avoid any transfer . . . of an interest of the debtor in property . . . that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
. . .
(B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
(ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation[.]

11 U.S.C. § 548(a)(1)(B). For purposes of this opinion, the only relevant element of Plaintiff's cause of action is whether Defendant gave reasonably equivalent value in exchange for the transfers.

In his post-trial brief, Plaintiff first argues that while he has the burden to prove every element of the claim by a preponderance of the evidence, the burden of proof shifts to Defendant if Plaintiff has shown certain badges of fraud such as inadequate consideration, the relationship between the parties or a pending or threatened litigation. Plaintiff relies on *Silagy v. Gagon* (*In re Gabor*), 280 B.R. 149,155-6 (Bankr. N.D. Ohio 2002).[11] Plaintiff thereafter cites to Section 548(c) of the Bankruptcy Code, which provides an affirmative defense that allows a transferee who takes for value and in good faith to have a lien or retain any interest transferred to the extent that the transferee gave value to the debtor in exchange for the transfer. Per *Leonard v. Coolidge* (*In re National Audit Def. Network*), 367 B.R. 207, 224 (Bankr. D. Nev. 2007), Plaintiff contends that Defendant, as the transferee, has the burden of proof on this affirmative defense. Finally, Plaintiff

---

[11] Here, Plaintiff points out that Defendant has not asserted an affirmative defense under Section 548(c) in his answer and affirmative defenses, and as such, the affirmative defense has been waived, citing *Henricks v. Pickaway Correctional Institute*, 782 F.3d 744, 750 (6th Cir. 2015).

contends that contract principles under Michigan state law apply in establishing the existence of an antecedent debt.

Defendant stresses that because Plaintiff has the burden to establish that Debtor did not receive reasonably equivalent value in exchange for the transfers, Plaintiff has the burden of establishing that the Advances were not loans or that the Advances did not give rise to some other form of debt owed by Debtor to Defendant.  Defendant argues that the determination of whether the Advances constitute debt or equity is governed by state law per *United States v. Butner*, 440 U.S. 48 (1979).  Defendant claims that the advances constitute a "claim" for purposes of 11 U.S.C. § 101(5) and are therefore a "debt" pursuant to § 101(12).  Defendant, therefore, concludes that payments made on account of an antecedent debt constitute value under § 548(d)(2)(A).  Lastly, Defendant contends that while some courts hold that a defendant may have the burden of moving forward with respect to "reasonably equivalent value" under § 548, Defendant disagrees, without citing to any authority.  Defendant simply argues that "unlike the defenses under § 547(c), the Bankruptcy Code does not state that the defendant has the burden of proving 'reasonably equivalent value.'"  (Def.'s Findings of Fact and Conclusions of Law, 21, ECF No. 190).

The Court concludes that Plaintiff has the burden to prove by a preponderance of the evidence that Debtor received less than reasonably equivalent value in exchange for the transfer or obligation.  *Lisle v. John Wiley & Sons, Inc.* (*In re Wilkinson*), 196 F. App'x 337, 341 (6th Cir. 2006) ("A trustee seeking to avoid a transfer carries the burden of proving each statutory element by a preponderance of the evidence.").

The Bankruptcy Code does not define "reasonably equivalent value," but defines "value" for the purpose of determining whether a transfer is fraudulent as "property, or satisfaction or

29

securing of a present or antecedent debt of the debtor . . . ." 11 U.S.C. § 548(d)(2)(A); see also *In re Wilkinson*, 196 F. App'x at 341. Thus, payment of a pre-existing debt is value.

The term "debt" is defined by the Code as "liability on a claim." 11 U.S.C. § 101(12). "Claim" in turn is defined, in pertinent part, as the "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured[.]" 11 U.S.C. § 101(5). Accordingly, to the extent a transfer was made in satisfaction of a claim, or a "right to payment," the transfer was made for "reasonably equivalent value" under § 548(a)(1)(B)(i).

Whether a right to payment exists is determined by state law. *Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 450–51, 127 S. Ct. 1199, 1205 (2007). The Supreme Court in *Travelers Cas. & Sur. Co. of Am.* provided,

> Indeed, we have long recognized that the " 'basic federal rule' in bankruptcy is that state law governs the substance of claims, Congress having 'generally left the determination of property rights in the assets of a bankrupt's estate to state law.' " *Ibid.* (quoting *Butner v. United States,* 440 U.S. 48, 57, 54, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979); citation omitted). Accordingly, when the Bankruptcy Code uses the word "claim"—which the Code itself defines as a "right to payment," 11 U.S.C. § 101(5)(A)—it is usually referring to a right to payment recognized under state law. As we stated in *Butner,* "[p]roperty interests are created and defined by state law," and "[u]nless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding." 440 U.S., at 55, 99 S.Ct. 914; accord, *Vanston Bondholders Protective Comm. v. Green,* 329 U.S. 156, 161, 67 S.Ct. 237, 91 L.Ed. 162 (1946) ("What claims of creditors are valid and subsisting obligations against the bankrupt at the time a petition in bankruptcy is filed is a question which, in the absence of overruling federal law, is to be determined by reference to state law").

*Id.* at 450–51, 127 S. Ct. at 1205.

Plaintiff's reliance on the burden shifting based on a showing of certain badges of fraud in *In re Gabor* is misplaced. This burden shifting is applicable to the actual fraud analysis under § 548(a)(1)(A) because fraudulent intent is difficult to prove—intent is irrelevant to a constructive

fraud claim.[12]  While the burden of proof or production may shift under appropriate circumstances, those circumstances were not raised or briefed for the Court.  Furthermore, as previously noted, the § 548(c) defense has not been raised in any of the pleadings leading up to, or during, trial and will not be addressed in this opinion.  As the parties stipulated that Defendant advanced $1,632,333.34 to Debtor prepetition and Debtor transferred $571,939.44 to Defendant, Plaintiff must establish that the Advances constituted capital contributions to satisfy the "less than reasonably equivalent value" requirement.

### ii. Constructive Fraud under M.C.L. § 566.35

Turning to constructive fraud under state law, Mich. Comp. Laws Ann. § 566.35 provides:

> Sec. 5. (1) A transfer made or obligation incurred by a debtor is voidable as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

M.C.L. § 566.35.  "The requirements for avoidance of a transfer as a constructive fraud on creditors are essentially the same under the Bankruptcy Code's avoidance provision and the Uniform Fraudulent Transfer Act, applicable under 11 U.S.C. § 544(b)." *Hagan v. Goldstein* (*In re Goldstein*), 428 B.R. 733, 735 (Bankr. W.D. Mich. 2010).  "In particular, Section 548 avoids transfers by insolvent debtors if the debtor had received less than 'reasonably equivalent value' in return and Section 544(b) incorporates Michigan's version of the Uniform Fraudulent Transfer Act

---

[12]  *In re Gabor* analyzed whether a debtor's prepetition transfer of a home to his children was fraudulent under both actual and constructive fraud statutes.  The court discussed that "[b]adges of fraud can raise presumptions of actual fraudulent intent, and the presumptions can establish a prima facie case and shift the burden to debtor to establish the absence of fraudulent intent." *In re Gabor*, 280 B.R. at 157.  Inadequate consideration can be a single badge of fraud.  However, the debtor's intent or knowledge is irrelevant to a constructive fraud claim; accordingly, without other authority to the contrary, this burden shifting is not applicable. *Id.* In other words, a showing of some badges of fraud does not relieve Plaintiff from his burden of establishing less than reasonably equivalent value under Section 548(a)(1)(B).

("MUFTA")[13] and its prohibition of transfers made for inadequate value whenever the debtor is insolvent." *Richardson v. Checker Acquisition Corp.* (*In re Checker Motors Corp.*)*,* 495 B.R. 355, 357 (Bankr. W.D. Mich. 2013). Section 544 "allows the trustee to step into the shoes of a creditor in order to nullify transfers voidable under state fraudulent conveyance acts for the benefit of all creditors." *Taunt v. Hurtado* (*In re Hurtado*), 342 F.3d 528, 531–32 (6th Cir. 2003) (internal citation omitted).

Under M.C.L. § 566.35, Plaintiff asserts that he has the burden to prove by a preponderance of the evidence that Debtor made the transfer without receiving reasonably equivalent value in exchange for each transfer and Debtor was insolvent at that time or became insolvent as a result of the transfer. Plaintiff cites to *Dearborn St. Bldg. Assocs, LLC v. D&T Land Holdings, LLC,* 2009 WL 3011245 (W.D. Mich. Sept. 16, 2009). Plaintiff further relies on Michigan case law interpreting the Uniform Fraudulent Conveyance Act ("UFCA"), which was replaced by MUFTA in 1998, arguing that the case law is still good law as MUFTA did not fundamentally alter UFCA with regard to the reasonably equivalent value analysis. Under these cases, and specifically *Plymouth United Savings Bank v. Lee*, 278 Mich. 545, 270 N.W. 781 (1936), Plaintiff maintains

---

[13] Effective April 10, 2017, MUFTA has been replaced by the Uniform Voidable Transfer Act ("UVTA"). M.C.L. § 566.45(1). The amendments and additions set forth in UVTA do not apply to the transfers at issue as they arose prior to the effective date of the amendatory act. See M.C.L. § 566.45(2):

> (2) All of the following apply to sections 1 to 13 as amended, and to section 14 and this section as added, by the amendatory act that added this section:
>> (a) The sections as amended or added apply to a transfer made or obligation incurred on or after the effective date of the amendatory act that added this section.
>> (b) The sections as amended or added do not apply to a transfer made or obligation incurred before the effective date of the amendatory act that added this section.
>> (c) The sections as amended or added do not apply to a right of action that accrued before the effective date of the amendatory act that added this section.
>> (d) For purposes of this subsection, a transfer is made and an obligation is incurred at the time provided in section 6.

M.C.L. §566.45(2).

that Defendant, as the transferee claiming that the transfers were in payment of an antecedent debt, has the burden of proving the existence of the debt.[14]  Plaintiff additionally relies on *Retirement Benefit Plan of Graphic Arts International Union Local 20-B v. Standard Bindery Co.*, 654 F. Supp. at 774.

With respect to the burden of proof, Defendant does not specifically address *Plymouth United Savings Bank* or *Standard Bindery Co*; rather, Defendant relies on M.C.L. § 566.35 which provides that "the creditor making a claim for relief under subsections (1) and (2) has the burden of proving the elements of the claim by a preponderance of the evidence."  M.C.L. § 566.35(3). Therefore, Defendant claims that Plaintiff, as the trustee stepping into the shoes of a creditor, has the burden of establishing that the Advances were not loans or did not give rise to some other form of debt owed by Debtor to Defendant.  As with his Section 548(c) argument, Defendant disputes that M.C.L. § 566.38(4) is an affirmative defense or that he has waived it, should it become relevant.

Defendant stresses that the primary issue with respect to Plaintiff's fraudulent transfer claim is that "value," as that term is used in both Section 548 and MUFTA, "means property, or satisfaction or securing of a present or antecedent debt of the debtor." Further the Advances constitute a "claim" for purposes of M.C.L. § 566.31(c) and are therefore a "debt" pursuant to

---

[14] As with the affirmative defense under Section 548(c), Plaintiff argues that M.C.L. § 566.38(4) provides a similar affirmative defense, which Defendant has waived by failing to plead it in his answer and affirmative defenses. Specifically, M.C.L. § 566.38 (4) states

> (4) Notwithstanding the voidability of a transfer or an obligation under this act, a good-faith transferee or obligee is entitled, to the extent of the value given the debtor for the transfer or obligation, to 1 or more of the following:
> (a) A lien on or a right to retain an interest in the asset transferred.
> (b) Enforcement of an obligation incurred.
> (c) A reduction in the amount of the liability on the judgment.

M.C.L. § 566.38(4).

M.C.L. § 566.31(e). Finally, Defendant provides that payments made on account of an antecedent debt constitute value under M.C.L. § 566.33.

The Court concludes that the burden under M.C.L. § 566.35 rests with the Plaintiff to prove that Debtor made the transfer without receiving reasonably equivalent value in exchange for each transfer. The statute is clear. The Court finds that *Plymouth United Savings Bank* does not expressly support Plaintiff's argument that the burden is on the transferee to prove that payments were on account of antecedent debt. The case is silent on who has the burden of proof and hinges entirely on the exclusion of testimony of an adverse party as to matters equally within the knowledge of the deceased.[15] *Plymouth United Sav. Bank,* 278 Mich. at 548–49, 270 N.W. at 782. In *Plymouth United Sav. Bank*, because there was no evidence establishing a contract for services there was no antecedent debt.

---

[15] *Plymouth United Sav. Bank v. Lee,* 278 Mich. 545, 547–48, 270 N.W. 781, 782 (1936),

> There is no doubt but that he rendered valuable services and furnished materials for his father and that he also managed the collection and disbursement of income from the farm. No books were kept; no accounting was had between the parties and no account stated was ever arrived at; nor does there seem to have been any demand made, nor any contract entered into for the services. The testimony of George Lee, Jr., if admissible, might tend to show some indefinite agreement that he was to be paid for his services. However, inasmuch as this testimony was incompetent, the record does not contain proof of any contract for compensation. Under the Fraudulent Conveyance Act (Act No. 310, P.A.1919, 3 C.L.1929, § 13392 et seq.), section 13394, C.L.1929, a fair consideration to support a conveyance may consist it is necessary to show that such debt . . . existed. The judge stated in his opinion: 'In my opinion George himself is not a competent witness to testify either to services rendered or goods furnished to the deceased. With this testimony eliminated the record does not disclose any very satisfactory evidence as to materials furnished to the father or as to whether these materials were paid for when received. Moreover there is nothing to show an express agreement of the father at the time the services were rendered to pay for them, and being a son they would be presumed to be gratuitous.

> . . .

> The court reached the correct conclusion. The decision of the case hinges entirely upon whether or not the testimony of George Lee, Jr., should have been excluded under section 14219, C.L.1929, which forbids the admission of testimony of an adverse *549 party as to matters equally within the knowledge of the deceased.

*Id*. at 547-549, 270 N.W. at 782.

"Like the Bankruptcy Code, [MUFTA] does not define reasonably equivalent value. As interpreted by the case law, reasonably equivalent value under the Michigan statute is substantially the same as under the Bankruptcy Code." *Wells v. Salmo* (*In re Select One, Inc.*)*,* 556 B.R. 826, 849 (Bankr. E.D. Mich. 2013) (citing *Allard v. Flamingo Hilton* (*In re Chomakos*)*,* 69 F.3d 769, 770 (6th Cir.1995)). Section 566.33(1) of MUFTA provides,

> Value is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied.

M.C.L. § 566.33. *See also Dillard v. Schlussel,* 308 Mich. App. 429, 457, 865 N.W.2d 648, 662 (2014). "Debt" is defined as "liability on a claim." M.C.L. § 566.31(e). "Claim" is "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured." M.C.L. § 566.31(c).

### iii. Whether the Advances Constituted a "Right to Payment" under State Law

Both parties rely on Michigan law for determining the existence of a loan. Plaintiff cites to the following cases in support of his argument that the Advances were not loans, *Dugan v. Vlcko*, 307 F. Supp. 3d 684 (E.D. Mich. 2018); *Young v. International Union, UAW, Local 651*, 148 F. Supp. 3d 602 (E.D. Mich. 2015); *Parker v. Baldwin*, 216 Mich. 472, 185 N.W. 746 (1921); and *People v. Lee*, 447 Mich. 552, 526 N.W.2d 882 (1994).

Plaintiff asserts that a promissory note is a written contract. *Dugan,* 307 F. Supp. 3d at 694. In enforcing a contract, Plaintiff argues that a party needs to provide the relevant terms allegedly breached. The relevant passage relied on by Plaintiff in *Young,* 148 F. Supp. 3d at 616, provides,

> " 'It is a basic tenet of contract law that a party can only advance a claim of breach of written contract by identifying and presenting the actual terms of the contract allegedly breached.' *Harris v. American Postal Workers Union,* 198 F.3d 245 [published in full-text format at 1999 U.S. App. LEXIS 26601], 1999 WL 993882, at *4 (6th Cir. Oct. 19, 1999); *see also Northampton Restaurant Group, Inc. v.*

35

*FirstMerit Bank, N.A.,* 492 Fed. Appx. 518, 522 (6th Cir. 2012). Without the introduction of the alleged terms, neither the district court nor the jury can find for the party seeking to recover for breach of the contract. *Harris*, 1999 U.S. App. LEXIS 26601, 1999 WL 993882, at *4."

*Id*. Additionally, Plaintiff maintains that the Michigan Supreme Court in *Parker* stated that

A promissory note may be defined to be a written unconditional promise by one person to pay another person therein named, or order, a fixed sum of money, at all events, and at a time specified. No contract or agreement is a promissory note which does not provide for payment of money, absolutely and unconditionally.

*Parker*, 216 Mich. at 474. Finally, Plaintiff contends that under *Lee*, a loan only occurs when there is an absolute obligation to repay. *Lee*, 447 Mich. at 558-59.

Plaintiff argues that Defendant failed to demonstrate that the payments listed on Exhibit B to the second amended complaint were in payment of antecedent debt as (1) Defendant only produced two signed promissory notes; (2) Defendant did not know if the notes were repaid; and (3) neither Defendant, Mr. Berry or Ms. Feighner could correlate any of the transfers on Exhibit B to the second amended complaint to any of the Advances listed on Exhibit A.

In response, Defendant argues that although his claim was evidenced by promissory notes, the claim is not "based on" a writing; rather, it is based on nearly $1.6 million in monies loaned by Defendant to Debtor. Defendant points out that the parties stipulated to the amount of the monies advanced and the amount of repayments in the final pretrial order.

Defendant maintains that no promissory note is required under the statute of frauds, M.C.L. § 566.132, and claims that an oral promise to repay a loan is enforceable, relying on *Pratt v. Bates*, 40 Mich. 37, 39-40 (1879). Thus, Defendant argues that a loan is like any other contract and is enforceable in accordance with the agreed terms, per *Ramco Hartland L.L.C. v. Landmark/Mansour Dev.*, 2011 WL 445816 (Mich. App. Feb. 8, 2011); and *Dobbelaere v. Auto-Owners Ins. Co.,* 275 Mich. App. 527, 740 N.W.2d 503, 529 (2007). Defendant explains that the

36

primary task of Michigan courts in enforcing any contract is to discern the intent of the contracting parties. *City of Grosse Pointe Park v. Mich. Mun. Liab. & Prop. Pool,* 473 Mich. 188, 218, 702 N.W.2d 106, 124 (2005); and *Michigan Chandelier Co. v. Morse*, 297 Mich. 41, 49, 297 N.W. 64, 67 (1941).

Defendant further contends that there are no technical requirements to establish debt based upon a loan under Michigan law. Moreover, Defendant argues that an alleged ambiguity with respect to some terms such as a due date or interest rate will not defeat a finding of a loan, as Michigan law provides that missing or indefinite terms can be supplied under the reasonableness standard. Defendant relies on *Vision Info. Servs., LLC v. Tocco*, No. 258422, 2005 WL 3479839 (Mich. App. Dec. 20, 2005), where the Michigan Court of Appeals determined that an advance was in fact a loan despite missing terms, citing:

> When a contract contains essential terms, but omits details of performance, the law supplies the missing details by construction. *Nichols v Seaks*, 296 Mich. 154, 159; 295 NW 596 (1941). If an important contractual term, such as the price or the time of performance, is indefinite, the trial court has the discretion to supply the term under the reasonableness standard. See *JW Knapp Co v Sinas*, 19 Mich. App. 427, 430-431; 172 NW2d 867 (1969). Furthermore, our Supreme Court has held that where there is no time stated for payment of a mortgage loan, the law presumes payment in a reasonable time. *Siegel v Sharrard*, 276 Mich. 668, 672-673; 268 NW 775 (1936) ("While there was no agreement as to the time of payment, it cannot be assumed that the loan was to go on forever . . . . Where no time for payment is stated, the law will presume a reasonable time."). Similarly, it was appropriate for the trial court to conclude in this case that a reasonable time for repayment was when defendant was able to repay the loan. To the extent that the trial court relied on *Dewey* in concluding that it was reasonable to require repayment of the $100,000 when defendant had the ability to repay the money, such reliance was not improper. When a loan agreement does not include a term providing for a time for repayment, the law presumes a reasonable time. See *id*. The trial court had the discretion to conclude that a reasonable time for defendant to repay his debt was when defendant was financially able to repay the $ 100,000.

*Vision Info. Servs., LLC*, 2005 WL 3479839, at *4. Regardless, Defendant argues that the Loan Summary and the various signed and unsigned notes show the terms of each of the loans.

37

Additionally, Defendant claims that Plaintiff's cases are inapplicable. First, Defendant distinguishes *Young* claiming that the case "involved claims for challenged employment benefits that were not established. It was up to the plaintiffs to establish their entitlement to the alleged benefits." (Def.'s Post-Trial Brief, 6). Here, Defendant contends that it is undisputed that Defendant paid Debtor over $1.6 million in advances. Next, Defendant claims that *Parker* is also distinguishable as there, the court held that the document, because it allowed for the satisfaction of the obligation by means of the delivery of a quantity of potatoes, was not a promissory note. Finally, Defendant maintains that *Lee* is inapplicable as the case interpreted a loan under a criminal usury statute and the transaction there was not a loan, but an exchange of $2,600 for a Rolex watch with the option to repurchase for a greater amount.

Lastly, Defendant argues that "correlation" between a particular note and a particular payment does not make it more or less likely that a particular advance was a loan rather than a capital contribution. Defendant maintains that Debtor could account for loans and repayments using one or more accounts in its accounting systems. Defendant claims that Debtor used a general-ledger system of accounting, and therefore would not have applied a payment to reduce the balance owed to Defendant with respect to a specific advance. Thus, it is irrelevant whether Mr. Berry or Ms. Feighner were "successful" in matching payments made by Debtor to particular advances. Defendant claims that there was no evidence that they tried to do so, or that the results of the exercise have any legal significance.

The Court finds that none of the cases cited by the parties are factually on point. Furthermore, while both parties cited contract principles, neither side applied the law to the two signed promissory notes or to the remaining transactions.

"A promissory note may be defined to be a written unconditional promise by one person to pay another person therein named, or order, a fixed sum of money at all events and at a time specified. No contract or agreement is a promissory note which does not provide for the payment of money absolutely and unconditionally." *Parker*, 216 Mich. at 474. Furthermore, a "promissory note is a binding contract under Michigan law from which a breach of contract claim can arise." *Dugan*, 307 F. Supp. 3d at 684. The Court further agrees with *Young*, in that "it is a basic tenet of contract law that a party can only advance a claim of breach of written contract by identifying and presenting the actual terms of the contract allegedly breached[,]" and further that "[w]ithout the introduction of the alleged terms, neither the district court nor the jury can find for [p]laintiff" in a breach of contract action. *Young*, 148 F.Supp.3d at 161. Other than the two executed notes--we do not have written contracts to interpret. Defendant is not basing his claim that the Advances were loans on a writing.

A loan is "an advance of money with an absolute promise to repay[,]" *Lee*, 447 Mich. at 559, and a loan does not necessarily need to be evidenced by a writing. M.C.L. § 566.132. The statute of frauds, M.C.L. § 566.132(1)(b), in relevant part only requires a writing when dealing with "a special promise to answer for the debt … of another person"; or if an action is brought against a financial institution to enforce a promise to lend money. M.C.L. § 566.132(2)(a). In the case at bar, the Advances at issue are based on the original agreement between Defendant and Debtor; not a promise to pay a debt of a third person. Also, the Hospital is not a financial institution. Accordingly, no writing is required.

Michigan contract principles are summarized in *51382 Gratiot Ave. Holdings, LLC v. Chesterfield Dev. Co., LLC*, 835 F. Supp. 2d 384, 391–92 (E.D. Mich. 2011),

 "The primary goal in interpreting contracts is to determine and enforce the parties' intent." *Old Kent Bank v. Sobczak,* 243 Mich.App. 57, 620 N.W.2d 663, 666–67

(2000) (citing *Rasheed v. Chrysler Corp.,* 445 Mich. 109, 517 N.W.2d 19, 29 n. 28 (1994)). "In ascertaining the meaning of a contract, [the court] give[s] the words used in the contract their plain and ordinary meaning that would be apparent to a reader of the instrument." *Rory v. Cont'l Ins. Co.,* 473 Mich. 457, 703 N.W.2d 23, 28 (2005) (citing *Wilkie v. Auto–Owners Ins. Co.,* 469 Mich. 41, 664 N.W.2d 776, 780 (2003)). Additionally, a contract must be "construed as a whole"; "[e]very word in the agreement must be taken to have been used for a purpose, and no word should be rejected as mere surplusage if the court can discover any reasonable purpose thereof which can be gathered from the whole instrument." *Associated Truck Lines, Inc. v. Baer,* 346 Mich. 106, 77 N.W.2d 384, 386 (1956) (quoting *Laevin v. St. Vincent De Paul Soc'y,* 323 Mich. 607, 36 N.W.2d 163, 164 (1949)) (internal quotation marks omitted).

If, in applying these principles, a court determines that "the contractual language is unambiguous, [it] must interpret and enforce the contract as written, because an unambiguous contract reflects the parties' intent as a matter of law." *In re Smith Trust,* 480 Mich. 19, 745 N.W.2d 754, 758 (2008) (citing *Frankenmuth Mut. Ins. Co. v. Masters,* 460 Mich. 105, 595 N.W.2d 832, 837 (1999)). . . . Accordingly, a court may not consider extrinsic evidence of the parties' intent to vary the meaning of a contract that is clear and unambiguous. *Burkhardt v. Bailey,* 260 Mich.App. 636, 680 N.W.2d 453, 464 (2004).

However, if the court concludes that the terms of a contract are ambiguous, "a factual question is presented as to the meaning of its provisions." *Klapp v. United Ins. Grp. Agency, Inc.,* 468 Mich. 459, 663 N.W.2d 447, 454 (2003). "A contract is ambiguous when two provisions 'irreconcilably conflict with each other,' " *Coates v. Bastian Bros., Inc.,* 276 Mich.App. 498, 741 N.W.2d 539, 543 (2007) (quoting *Klapp,* 663 N.W.2d at 453), "or 'when [a term] is equally susceptible to more than a single meaning,' " *id.* (alteration in original) (quoting *Mayor of City of Lansing v. Mich. Pub. Serv. Comm.,* 470 Mich. 154, 680 N.W.2d 840, 847 (2004)). Additionally, a contract suffers from a "latent ambiguity" when "the language in a contract appears to be clear and intelligible and suggests a single meaning, but other facts create the 'necessity for interpretation or a choice among two or more possible meanings.' " *Shay v. Aldrich,* 487 Mich. 648, 790 N.W.2d 629, 641 (2010) (quoting *McCarty v. Mercury Metalcraft Co.,* 372 Mich. 567, 127 N.W.2d 340, 344 (1964)).

*51382 Gratiot Ave. Holdings,* LLC, 835 F. Supp. 2d at 391–92.

In the event of a latent ambiguity, "[b]ecause 'the detection of a latent ambiguity requires a consideration of factors outside the instrument itself, extrinsic evidence is obviously admissible to prove the existence of the ambiguity, as well as to resolve any ambiguity proven to exist.'" *City*

40

*of Grosse Pointe Park*, 473 Mich. at 197–98, 702 N.W.2d at 113 (internal citation omitted).[16] The

admission of extrinsic evidence does not violate the parol evidence rule "where the language of

the instrument itself taken alone is such that it does not clearly express the intention of the parties

or the subject of the agreement." *Klapp v. United Ins. Grp. Agency, Inc.,* 468 Mich. 459, 469–70,

663 N.W.2d 447, 453–54 (2003).

However, the extrinsic evidence is admissible only "to indicate the actual intent of the

parties as an aid to the construction of the contract." *City of Grosse Pointe Park,* 473 Mich. at 198.

"'An omission or mistake is not an ambiguity. Parol evidence under the guise of a claimed latent

ambiguity is not permissible to vary, add to, or contradict the plainly expressed terms of this

writing, or to substitute a different contract for it, to show an intention or purpose not therein

expressed." *Shay v. Aldrich,* 487 Mich. 648, 680, 790 N.W.2d 629, 647 (2010) (quoting *Michigan*

*Chandelier Co. v. Morse*, 297 Mich. 41, 48, 297 N.W. 64, 66–67 (1941)).

### c. Conclusions of Law

i. <u>Application of State Law Right to Payment to Two Executed Promissory Notes</u>

The Court will first turn to the two signed promissory notes. The first executed note dated

July 1, 2011 identifies Debtor as the borrower and Defendant as the lender. (Def.'s Ex. E). The

note is in the principal amount of $100,000.00 with an annual interest rate of 20%. The note

---

[16] Furthermore,

> The court "cannot create ambiguity where the terms of the contract are clear." *City of Grosse Pointe Park v. Mich. Mun. Liab. & Prop. Pool,* 473 Mich. 188, 702 N.W.2d 106, 113 (2005) (Cavanagh, J., writing for an equally divided court) (internal quotation marks omitted). "[I]f a contract, however inartfully worded or clumsily arranged, fairly admits of but one interpretation it may not be said to be ambiguous or, indeed, fatally unclear." *Raska v. Farm Bureau Mut. Ins. Co. of Mich.,* 412 Mich. 355, 314 N.W.2d 440, 441 (1982). Furthermore, "the parties' disagreement regarding the meaning of contract language does not, by itself, create an ambiguity." *Harbor Park Market, Inc. v. Gronda,* 277 Mich.App. 126, 743 N.W.2d 585, 589 n. 3 (2007) (citing *Gortney v. Norfolk & W. Ry. Co.,* 216 Mich.App. 535, 549 N.W.2d 612, 615 (1996)).

*51382 Gratiot Ave. Holdings,* LLC, 835 F. Supp. 2d at 391–92.

provides for monthly installment payments of $1,667.00 due on the first day of the month with the principal repaid in its entirety by the end of December 31, 2012. Under this note, the parties have waived "demand, presentment and protest and all notices hereto[,]" and agreed "to remain bound notwithstanding any extension, modification, waiver, or other indulgence or discharge or release of any obligor hereunder or exchange, substitution, or release of any collateral granted as security for this note."

The second executed note dated December 28, 2012 is in the principal amount of $114,000.00. (Def.'s Ex. F). This note likewise identifies Debtor as the borrower and Defendant as the lender. Under the terms of this note,

> Borrower shall pay to Lender monthly installments of interest only on the principal amount then outstanding on the first day of each month commencing on July, 1, 2013 and continuing on the first(1st) day of each month thereafter until the later of December 31, 2013 or the date that is sixty (60) days following Borrower's receipt of Lender's "Demand Notice" (as hereinafter defined) (the "Maturity Date"), when the outstanding principal balance and all accrued and unpaid interest is due and payable, . . . .

> The outstanding principal balance of this Note shall bear interest until the Maturity Date (whether by acceleration or otherwise) at a fixed rate of interest of ten (10%) percent per annum (the "Interest Rate").

(Def.'s Ex. F). The note also provides for a late charge of five (5%) percent of the payment amount if any payment is not received within 10 (ten) days of the due date. (Def.'s Ex. F). Additionally, the Borrower waived "presentment for payment, demand, notice of non-payment notice of protest and protest of this Note, diligence in collection or bringing suit."

The Court finds both executed notes unambiguous. As such, the Court is bound by the terms contained within the four corners of each note and cannot consider extrinsic evidence in interpreting the parties' intent. Accordingly, because both notes provide for a definite unconditional obligation of repayment, they evidence loans.

ii. <u>Application of State Law Right to Payment to the Four Unsigned Notes and Remaining Missing Notes</u>

The issue before the Court is not whether the terms are ambiguous or that missing terms may be supplied under the reasonableness standard; rather, the issue is whether a loan existed and if so under what terms. The cited cases interpreting written contracts are of limited value to the Court's analysis. Defendant mainly relies on *Vision Information Services*[17] for the proposition that "[w]hen a contract contains essential terms, but omits details of performance, the law supplies missing details by construction." *Vision Info. Servs., LLC*, 2005 WL 3479839, at *4.

Defendant is asking the Court to supply the entire contract, not merely missing terms. There is no credible evidence that the unsigned notes and alleged missing notes were ever executed. Furthermore, there is no evidence before the Court regarding the terms for these Advances. Accordingly, there is no credible evidence establishing an agreement of an unconditional promise to pay. Without an unconditional promise to pay, there is no loan. As such, Plaintiff has established that there exists no right to payment under Michigan law for these remaining Advances. With no right to payment, Defendant does not have a "claim", and in turn, no "debt" as defined under §§ 101(12) and 101(5), respectively. The transfers were not made on account of an antecedent debt of Debtor. Therefore, Plaintiff has satisfied his burden under § 548(a)(1)(B) and

---

[17] It is true that in *Vision* there was no written contract or agreement regarding the alleged loan between a third party and a defendant; the executed agreement was for the assignment of the loan to plaintiff. *Vision*, at *1. However, the court did not provide a legal analysis for the existence of the original loan as defendant admitted in his answer to the complaint that the third party "personally loaned defendant the sum of $100,000[,]" and admitted in "his deposition that the $100,000 was a loan." *Vision*, at *3. The focus of the court's analysis was on defendant's ability to repay. In doing so, the court stated, "[w]hen a contract contains essential terms, but omits details of performance, the law supplies missing details by construction." The court relied on *Downey v. Charlevoix Co Bd of Co Rd Comm'rs*, 227 Mich. App. 621, 576 N.W.2d 712 (1998) "for the logic of its holding that when there is no specific time stated for repayment of a loan, a demand on the loan is appropriate when the debtor has an ability to pay." *Vision*, at 4. Here, however, other than the two signed promissory notes, there is no credible evidence before the Court regarding whether the unsigned notes were executed or of the essential terms of the missing notes.

43

M.C.L. § 566.35 and established that Debtor did not receive reasonably equivalent value in exchange for the transfers.

### iii. Application of the *Roth Steel* Factors in Determining whether Advances were Debt or Capital Contributions

As a separate basis for proving that the transfers from Debtor to Defendant were not on account of antecedent debt, Plaintiff relies on the *Roth Steel* factors articulated in *In re AutoStyle Plastics, Inc.,* 269 F.3d at 749–50. As previously stated, the *Roth Steel* factors are equally relevant in evaluating whether an advance is debt or a capital contribution when making the determination of the reasonably equivalent value element under § 548(a)(1)(B) and M.C.L. § 566.35. The factors and analysis are as follows:

> (1) the names given to the instruments, if any, evidencing the indebtedness; (2) the presence or absence of a fixed maturity date and schedule of payments; (3) the presence or absence of a fixed rate of interest and interest payments; (4) the source of repayments; (5) the adequacy or inadequacy of capitalization; (6) the identity of interest between the creditor and the stockholder; (7) the security, if any, for the advances; (8) the corporation's ability to obtain financing from outside lending institutions; (9) the extent to which the advances were subordinated to the claims of outside creditors; (10) the extent to which the advances were used to acquire capital assets; and (11) the presence or absence of a sinking fund to provide repayments. *Roth Steel,* 800 F.2d at 630. No one factor is controlling or decisive. *Ibid.* The factors must be considered within the particular circumstances of each case. *Ibid.* We note that "[t]he more [a transaction] appears to reflect the characteristics of ... an arm's length negotiation, the more likely such a transaction is to be treated as debt." *In re Cold Harbor,* 204 B.R. at 915.

*Id*. at 749–50.

The first factor considers the names given to the instruments. *AutoStyle Plastics* specified that "[t]he absence of notes or other instruments of indebtedness is a strong indication that the advances were capital contributions and not loans." *Id*. at 750. Here, Plaintiff contends that, other than the two signed notes, Defendant acknowledged the absence of notes claiming they were lost or stolen. Ms. Feighner additionally searched for any documentation evidencing loans and was only able to find four unsigned notes. Defendant maintains that there were signed notes and in

44

support points to his own testimony to that effect, the Loan Summary referring to the notes, and the unsigned notes located in Debtor's records. However, the Court finds Defendant's testimony regarding the unexecuted notes extremely vague. Defendant did not keep track of the amount of money he advanced or how much was paid. Likewise, Defendant did not know the terms of the unsigned or missing notes. Second, the values from the unsigned notes were used by Ms. Feighner to complete the Loan Summary, so the Loan Summary is not evidence that the unsigned notes were executed pursuant to those terms. Third, the unsigned notes were not authenticated and were only admitted for the limited purpose of showing that the Advances were made. Finally, other than Defendant's self-serving testimony, there is no evidence that the missing notes were ever created. Excepting the Advances evidenced by the two executed notes, this factor weighs in favor of finding that the Advances were capital contributions.

The second factor is the presence or absence of a fixed maturity date and schedule of payments. "The absence of a fixed maturity date and a fixed obligation to repay is an indication that the advances were capital contributions and not loans." *Id*. Plaintiff asserts that other than the two signed notes, there is no evidence of a fixed maturity or a fixed obligation to repay. The Court agrees for the reasons already indicated in analyzing the first factor--the unsigned notes were not authenticated, and the maturity date on the Loan Summary is based on numbers from the unsigned notes. Even if the Court gives weight to the maturity dates listed on the Loan Summary, those dates have passed without Defendant seeking to collect on any of his alleged notes. As evidenced by the schedules of Advances and repayments created by Mr. Berry and Ms. Feighner (Pl.'s Exs. 4 and 5) and the testimonies of Mr. Berry, Ms. Feighner and Defendant--none of the transfers could be matched to the Advances. Furthermore, Defendant's and Dr. Singhal's affidavits from the OCCC case further demonstrate that, even if Defendant had executed notes,

Defendant found any notes meaningless and expected payment only when the Hospital was in a position to pay all the doctors' advances. Even more compelling is the fact that Defendant objected to Dr. Jolly's attempt to collect on his executed notes claiming they were investments and not loans. As a result, the Court finds that, other than the two executed notes, no credible evidence has been presented evidencing maturity dates for the alleged loans or an obligation to repay. This weighs in favor of finding the Advances were capital contributions.

The third factor focuses on the presence or absence of a fixed rate of interest and interest payments. Here, Plaintiff argues that, although there is evidence that Defendant received interest payments, he cannot correlate any of the transfers to the Advances. Additionally, Plaintiff points to Ms. Feighner's testimony that Debtor did not have an amortization schedule for loans. In addition, when she was instructed to make a payment, the person instructing her did not identify the loan being paid. Finally, Plaintiff claims that the Loan Summary indicates an interest payment in the amount of $11,932.00 was made to Defendant on December 1, 2014, however Defendant only declared interest payments received in the amount of $833.00 on his 2014 tax return. Defendant counters that this discrepancy is irrelevant to the determination of the Advances being loans. For the reasons already indicated above, and because Debtor did not set up an amortization system to keep track of loans and interest, this factor weighs in favor of finding the Advances were capital contributions.

The fourth factor is the source of repayments. "If the expectation of repayment depends solely on the success of the borrower's business, the transaction has the appearance of a capital contribution." *Id*. at 751. Plaintiff argues that pursuant to the affidavits filed in the OCCC, Defendant's expectation of payment depended on the financial success of Debtor. Defendant, however, argues that Debtor's management was instructed to make repayments to the members of

their loans on a regular basis, and in fact, Defendant received over $571,000.00 of repayments as cash flow permitted. The Court finds that Defendant's affidavit and in court testimony were clear that payment of his Advances depended on the Hospital's ability to pay all doctors. This factor weighs in favor of finding that the Advances were capital contributions.

The fifth factor focuses on the adequacy or inadequacy of capitalization. *AutoStyle Plastics* provides that "[t]hin or inadequate capitalization is strong evidence that the advances are capital contributions rather than loans." *Id*. at 751. Furthermore, capitalization is to be assessed initially, when "a corporation is started by the shareholders with a minimal amount of capital who then make a large loan of money to the newly formed corporation[,]" and also at the time when the transfers are made. *Id*. Plaintiff argues that it is undisputed that Debtor was insolvent since at least 2013 and could not pay payroll, taxes, vendors or medical malpractice insurance. Plaintiff further provides that the doctors were advised that they were prohibited by law from adding to their membership units; and have, nevertheless, been advancing additional money since at least 2010. In fact, pursuant to the board minutes dated April 13, 2013, "the only readily available short term financing are physicians at DHOM." (Def.'s Ex. N). Finally, per board minutes dated April 16, 2013, "This is the last time the Board will be providing funding and personally financing the hospital." (Def.'s Ex. N). Despite all of this, Defendant continued to make advances to Debtor after April 16, 2013. Without explanation, Defendant claims that this factor of thin or inadequate capitalization is not compelling. The Court disagrees. While no one factor is dispositive, undercapitalization is relevant and weighs in favor of finding that the Advances were capital contributions.

The sixth factor focuses on the identity of interest between the creditor and stockholder. Thus,

> "If stockholders make advances in proportion to their respective stock ownership, an equity contribution is indicated. *Ibid.* On the other hand, a sharply disproportionate ratio between a stockholder's percentage interest in stock and debt is indicative of bona fide debt. *Ibid.* "Where there is an exact correlation between the ownership interests of the equity holders and their proportionate share of the alleged loan ... this evidence standing alone is almost ... overwhelming." *In re Cold Harbor,* 204 B.R. at 919.

*Id*. at 751. Plaintiff maintains that the majority of the money that was advanced to Debtor came from the three largest shareholders—Defendant, Dr. Jolly and Dr. Singhal. Furthermore, on each occasion that these shareholders advanced money, the other shareholders were not asked for money because "[i]t wouldn't make any sense when they told us we were not putting in any more money." (Trial Tr., vol. 2, 61). However, Plaintiff acknowledges that Dr. Singhal testified that the advances were not in direct proportion to the equity ownership interests. Defendant stresses that this factor alone is dispositive. While the three largest shareholders advanced most of the money, their advances were not in proportion to their shares. The Court finds that this factor weighs in favor of finding the Advances were debt.

The seventh factor considers whether there was any security for the advances. "The absence of a security for an advance is a strong indication that the advances were capital contributions rather than loans." *Id*. at 752. Plaintiff claims that according to Dr. Singhal there was no collateral available to secure repayment of the money advanced to Debtor. Defendant disagrees that the absence of security for the loans is an indication that the loans were intended to be equity and further argues that (1) the Hospital's real property was collateral available to secure repayment; and (2) federal law required that the loans be unsecured, citing to Defendant's trial testimony. Defendant does not provide the legal authority that required the loans be unsecured. Merely citing to "federal law" is insufficient. Nonetheless, while security may have been

48

available, the fact remains that the evidence shows that none of the Advances were secured. Consequently, this factor weighs in favor of finding the Advances were capital contributions.

The eighth factor focuses on the corporation's ability to obtain outside financing. "When there is no evidence of other outside financing, the fact that no reasonable creditor would have acted in the same manner is strong evidence that the advances were capital contributions rather than loans." *Id*. at 752. Plaintiff asserts that Debtor could not borrow from traditional lenders, citing to Drs. Singhal's and Jolly's testimonies. Defendant contends that this factor should be "discounted or rejected unless the Court is to disregard the JFPTO and reverse its prior holding, rejecting retroactive recharacterization as a means for disqualifying antecedent debt as 'reasonably equivalent value' in the context of a fraudulent-transfer claim." (Def.'s Proposed Findings of Fact and Conclusions of Law, ¶ 8, ECF. 190). Defendant further argues that other courts have discredited this "inability to obtain outside financing" as a factor in recharacterization citing to *Gecker v. Flynn* (*In re Emerald Casino, Inc.*), 2015 WL 1843271 (N.D. Ill. April 21, 2015). Defendant mischaracterizes the Court's prior ruling. The Court did not previously hold that Plaintiff could not maintain a claim for recharacterization. Rather, the Court granted in part and denied in part Defendant's motion for dismissal of Count I under 12(b)(6), finding that it had the authority to recharacterize a claim per *In re AutoStyle Plastics, Inc.*[18] The Court granted the motion

---

[18] The Court further found,

> *In re AutoStyle Plastics* joined the line of cases allowing recharacterization of claims finding that its "power to do so stems from the authority vested in the bankruptcy courts to use their equitable powers to test the validity of debts." *Id*. at 748 (citing *In re Cold Harbor Assocs.,* 204 B.R. 904, 915 (Bankr.E.D.Va.1997); and *In re Fett Roofing & Sheet Metal Co., Inc.,* 438 F.Supp. 726, 729-30 (E.D.Va.1977)). "The source of the court's general equitable powers is § 105 of the Code, which states that bankruptcy judges have the authority to 'issue any order, process or judgment that is necessary or appropriate to carry out the provisions'of the Code.'" *Id*. (quoting 11 U.S.C. § 105(a)).

(Hr.'g Tr., March 15, 2018, ECF No. 118; Order Granting in part and Denying in part Def's Corrected Second Mot. For Summ. J. or, in the alt., Dismissal pursuant to Fed. R. Civ. P. 12(b)(6), ECF No. 119).

in part limiting Plaintiff's claim for recharacterization to Defendant's claim, finding that "a prerequisite for recharacterization is the existence of a claim." (Hr.'g Tr., March 15, 2018, ECF No. 118; Order Granting in part and Denying in part Def's Corrected Second Mot. For Summ. J. or, in the alt., Dismissal pursuant to Fed. R. Civ. P. 12(b)(6), ECF No. 119). Here, Plaintiff is using the *Roth Steel* factors as to establish his prima facie case under Section 548(a)(1)(B) that the Advances were capital contributions. That being clarified, the Court finds that the evidence is overwhelming that Debtor was unable to obtain outside financing. Besides Dr. Jolly's and Dr. Singhal's testimonies, the board minutes dated April 13, 2012 provided that "the only readily available short term financing are physicians at DHOM." (Def.'s Ex. N). This factor weighs in favor of finding that the Advances were capital contributions.

The ninth factor examines the extent to which advances were subordinated to the claims of outside creditors. "Subordination of advances to claims of all other creditors indicates that the advances were capital contributions and not loans." *Id.* at 752. Plaintiff points to Defendant's affidavit and in court testimony wherein he agreed not to demand payment until Debtor was "capable of paying all investors." Defendant, however, is adamant that there is no evidence that either Defendant's loans or loans of other members were subordinated to the claims of any other creditor. Defendant asserts that Debtor's management was expressly instructed that the member loans were not subordinate, citing again to his testimony. Defendant further claims that the loans made by various members were allegedly repaid when payroll taxes and insurance premiums went unpaid, citing to Plaintiff's counsel's opening argument. The Court acknowledges that some transfers have been made to Defendant and other doctors, however, these transfers have not been regular and again depended on Debtor's cash flow. Furthermore, evidence shows that other creditors were paid before these transfers were made; notably, the doctors were advancing money

to pay certain vendors. The Court finds Defendant's and Dr. Singhal's testimonies and affidavits clearly indicate that they agreed to subordinate their payments to a time when the Hospital was able to pay all the doctors. This factor weighs in favor of finding the Advances were capital contributions.

The tenth factor evaluates the extent to which advances were used to acquire capital assets. "Use of advances to meet the daily operating needs of the corporation, rather than to purchase capital assets, is indicative of bona fide indebtedness." *Id.* at 752. Here, Plaintiff points to Defendant's testimony that the advances were made for various purposes including buying equipment for Debtor. Defendant, however, argues that the advances were used for payroll and in only one instance were the advances used for repairs to the "chiller." The Advances were used for any expense necessary to keep the Hospital doors open. This factor does not favor finding that the Advances were either debt or capital contributions.

The eleventh factor considers the presence or absence of a sinking fund to provide repayments. "The failure to establish a sinking fund for repayment is evidence that the advances were capital contributions rather than loans." *Id*. at 753. Here, Plaintiff contends that Dr. Singhal testified that there was no fund established for payment of the Advances. Defendant though claims that there is no evidence that a "sinking fund" would be utilized by a debtor such as the Hospital to fund the repayment of loans. Further, that "[i]t has never been an issue under Michigan law in determining the intent of the parties to a loan." (Def.'s Proposed Findings of Fact and Conclusions of Law, ¶ 11, ECF. 190). Because these alleged loans were unsecured, a reserve or a sinking fund would be required to assure repayment. Defendant does not proffer any argument or evidence of another mechanism a hospital would use, instead of a sinking fund, to assure repayment of loans.

Accordingly, the Court finds that this factor weighs in favor of finding the Advances were capital contributions.

After considering all of the factors, the Court finds that overall the factors weigh in favor of finding that the Advances were capital contributions, not loans.[19]  As such, Plaintiff has satisfied his burden under § 548(a)(1)(B) and M.C.L. § 566.35, and established his prima facie case that the Advances were capital contributions and, therefore, the transfers were not on account of an antecedent debt.

## IV. CONLCUSION

For the foregoing reasons, the Court finds that the two Advances evidenced by executed promissory notes—the July 1, 2011 note in the principal amount of $100,000.00 and the December 28, 2012 note in the principal amount of $114,000.00—were loans.  The remaining Advances were capital contributions.  A separate order will be entered by the Court consistent with this opinion.

**Signed on February 01, 2019**

/s/ **Maria L. Oxholm**

**Maria L. Oxholm**
**United States Bankruptcy Judge**

---

[19] Plaintiff additionally cites to *Standard Bindery* claiming that findings on a number of the factors cited therein are similar to the case at bar.